# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| SYLVIA JOHNSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-1237 |
| | § | |
| SAKS FIFTH AVENUE TEXAS, LP, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM, OPINION, AND ORDER
## SETTING STATUS CONFERENCE

The plaintiff, Sylvia Johnson, sued her former employer, Saks Fifth Avenue of Texas, L.P. ("Saks"), on April 12, 2005. Johnson, who is African-American, asserts causes of action for race and sex discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981. Johnson alleges that: during her employment, she was subjected to a racially hostile work environment; she was disciplined and fired because of race and sex discrimination and retaliation; and Saks's compensation and promotion practices discriminated on the basis of race and sex. Saks has moved for summary judgment. (Docket Entry No. 17). Johnson has responded, (Docket Entry No. 18)[1]; Saks has replied, (Docket Entry No. 21); and Johnson has surreplied, (Docket Entry No. 22). Saks has also objected to portions of the affidavits filed in support of Johnson's response to the summary judgment

---

[1] Johnson's response to the summary judgment motion is at Docket Entry No. 18. The exhibits to that response are at Docket Entry No. 19.

motion, moving to strike portions of the affidavits.  (Docket Entry No. 20).  Johnson has responded to Saks's motion to strike.  (Docket Entry No. 23).

Based on a careful review of the motions, responses, reply, and surreply, the pleadings, and the applicable law, this court grants in part and denies in part Saks's motion to strike the affidavits that Johnson submitted in her response to Saks's summary judgment motion; grants the motion for summary judgment as to Johnson's claims of sex discrimination; grants the motion for summary judgment as to Johnson's claims of race discrimination and retaliation, except the claim that she was disciplined and terminated from her job in March 2004 because of her race.

A status conference is set for March 23, 2007, at 9:00 a.m., to set a schedule to resolve the issues remaining in the case.  The reasons for this court's rulings on the pending motions are set out below.

## I.    Background

Sylvia Johnson worked for Saks Fifth Avenue of Texas, L.P. at its Saks Off 5th store at the Fountains on the Lake shopping mall in Stafford, Texas from October 2000 until she was fired in March 2004.  Before she began working at Saks, Johnson worked for a different department store.  Johnson identifies two supervisors at Saks who she alleges were discriminatory.  The first is Harle Lyons, a Caucasian male who was the general manager at the Saks Fountains store during the relevant time period.  The second is Nancy Scott, a Caucasian female who was the department manager of the accessories, home, and children's departments at the store during the relevant time.

2

The Fountains store is subdivided into departments, each staffed by sales associates and selling specialists. The employees within each department report directly to a department manager. The department managers in turn report to the associate general manager and general manager, who manage the store. The general manager reports to the regional vice-president, who has responsibility over several area stores.

When Johnson was hired, she was a "sales associate." In September 2002, she was promoted to a "selling specialist" in the accessories department, the position she held until she was fired in March 2004. (Docket Entry No. 17, Ex. A-7). In early 2003, Scott became Johnson's immediate supervisor. Lyons hired Johnson in 2000, left the store soon after, and returned as the general manager in early 2003. (Docket Entry No. 17, Ex. A at 35:11–23). Jann Miller served as general manager during Lyons's absence, between 2000 and 2003. (*Id.* at 45:4–47:15).

As a sales associate, Johnson's job duties included assisting customers in selecting and purchasing merchandise, and keeping merchandise displays neat. (*Id.* at 39:3–11). When she began her employment with Saks, Johnson earned $7.50 per hour. She received regular pay increases during her first two years at Saks. (Docket Entry No. 17, Ex. A-7). As repeat customers became familiar with Johnson, many asked for her assistance. Over time, Johnson's clientele and sales grew. (Docket Entry No. 17, Ex. A at 166:8–18). Based on Johnson's performance, Jann Miller, the then-general manager, promoted Johnson to selling specialist in 2002. (Docket Entry No. 17, Ex. A-7). That promotion carried a pay increase from $9.00 to $10.00 per hour. (*Id.*). In March 2004, Johnson was earning $10.30 per hour.

3

(Docket Entry No. 18, Ex. G).  As a selling specialist, Johnson had the duties of a sales associate and the duties of maintaining her own clientele profile and of communicating store events such as upcoming sales to those clients.  (Docket Entry No. 17, Ex. A at 166:6–25). A sales specialist was expected to generate higher sales than a sales associate.

On January 14, 2004, Johnson notified Saks's human resources department that she wanted to start working part-time.  (Docket Entry No. 17, Ex. A at 167:11–25; Docket Entry No. 17, Ex. A-8).  Johnson worked part-time at Saks from January until March 2004, when she was discharged. Johnson alleges that she was fired because of discrimination.  Saks responds that it terminated Johnson's employment in March 2004 because of performance problems and insubordination.  Johnson's employment file contained several disciplinary write-ups for events as far back as December 2002.  Johnson asserts that she never received three of the disciplinary reports in her file and had not seen them before her deposition in April 2006.  As to the other write-ups, Johnson disputes that the events merited the discipline she received.

The first of these disciplinary write-ups is dated December 10, 2002 and reports excessive tardiness. (Docket Entry No. 17, Ex. A-3).  The report states that between October 8, 2002 and November 25, 2002, Johnson arrived late for work 12 times.  Her arrivals ranged from as little as 8 minutes late to as much as 29 minutes late.  (*Id.*).  Saks defines excessive lateness as "3 or more times late in 2 consecutive weeks; 5 or more times late in any 30 day period; or 10 times late in a 26 week period."  (*Id.*).  According to Saks, Johnson refused to sign the disciplinary write-up. Johnson argues in response to the summary judgment motion

that she had not seen this write-up before her deposition.  She states that she testified in her deposition that she had not seen this write-up, but the excerpts of Johnson's deposition transcript submitted as summary judgment evidence do not include this testimony.  (Docket Entry No. 18 at 5).  An illegible signature appears in the space on the disciplinary report for "supervisor's signature."

The second write-up is for a December 9, 2002 incident.  (Docket Entry No. 17, Ex. A-4).  Nga Le, a "lead associate" in the accessories department and one of Johnson's supervisors, talked to Johnson about her failure to do one of her job duties, "processing customer service put-aways," or "go-backs."  When Saks customers return an item, the return is made at the customer-service department.  The associates in each department are responsible for retrieving returned items from customer service every hour and restocking those items in their respective departments.  According to the disciplinary warning, Le verbally counseled Johnson about maintaining a regular procedure for collecting go-backs, and Johnson reacted unprofessionally to this criticism.  Le cited Johnson for insubordination. The report states that Johnson refused to sign the document.  (*Id.*).  Le's signature appears on the document along with that of Mireya Guerra,  an employee in Saks's human resources department.  In her deposition, Johnson testified that she had not previously seen the report for the December 9, 2002 incident.  She acknowledged that Le had counseled her about the go-back procedures but was unaware that the counseling had resulted in a disciplinary write-up and believed it was unwarranted.  (*Id.* at 68:5–69:3).  Johnson disputes that she was insubordinate to Le.  "It wasn't any, you know, it wasn't anything loud or anything.  All I

5

said to her was, I could not pick them up at the time that they want me to pick them up now because I have customers I'm trying to assist and when I get time, I will pick them up and I always pick them up before I leave here and everything." (Docket Entry No. 17, Ex. A at 67:24–68:5).

The third written disciplinary write-up in Johnson's employment file relates to a March 15, 2003 incident involving Johnson and a coworker, Bonita Thurston. (Docket Entry No. 17, Ex. A-5). The report states that Johnson acted inappropriately while on the sales floor by arguing with Thurston. Johnson does not dispute that the incident occurred. In her deposition, she explained that she and Thurston had a shouting match over releasing an item on hold for one of Thurston's customers so that Johnson could sell it to her customer. (Docket Entry No. 17, Ex. A at 76:7–18). Johnson testified that both she and Thurston were counseled for this incident. (*Id.* at 80:21–23). The written warning is dated March 29, 2003 and signed by Johnson, Harle Lyons, and Mireya Guerra.

Johnson's fourth disciplinary report, her "final warning," resulted from a June 18, 2003 incident involving Johnson and a customer. (Docket Entry No. 17, Ex. A-6). On that day, Johnson saw a little girl alone standing in the middle of an opened umbrella. Johnson testified that she was afraid the child might get hurt so she helped the child out of the umbrella and took it away. (Docket Entry No. 17, Ex. A at 82:15–95:17). Johnson testified that the girl's mother was angry that Johnson had taken the umbrella away from the child. Johnson testified that the woman yelled at her, ignoring her explanation. (*Id.* at 93:23–94:2). When the woman continued to yell and stuck her finger close to Johnson's face, Johnson told

6

the woman to leave the store.  (*Id.*).  Johnson testified that she did not receive any counseling

or discipline for this incident until three months later, when she received a "final warning."

Immediately after the incident, Guerra told Johnson, "Don't worry about.  We took care of

it."  (*Id.* at 90:22).   Shortly after the incident, Johnson spoke briefly with an employee in

Saks's loss-prevention department, explaining what had happened.  Johnson did not receive

any counseling in that meeting.  (*Id.* at 91:20–92:7).  Saks acknowledges that although the

incident occurred on June 18, 2003, a disciplinary report was not written until August 28,

2003 and not given to Johnson until September 23, 2003.  (Docket Entry No. 17, Ex. A-6).

The report stated that the delay was "due to time off of management and Sylvia [Johnson]."[2]

(*Id.*).  The report states that Johnson should have walked away from the encounter with the

---

[2] In its summary judgment motion, Saks argues that the meeting did not occur until late September 2003 because of "Johnson's part-time status" and certain managers' vacation schedules.  (Docket Entry No. 17 at 6).  Saks's summary judgment evidence shows that Johnson did not begin working part-time until January 2004.  (Docket Entry No. 17, Ex. A-8).  Saks's summary judgment motion also states that Saks administered Johnson's disciplinary action only two months after the incident, in August 2003.  (Docket Entry No. 17 at 6–7 & n.4).  The write-up is dated August 28, 2003, but both Lyons and Guerra signed the document on September 23, 2003.  (Docket Entry No. 17, Ex. A-6).  Johnson also testified that the meeting occurred in September rather than August:

> Q:    Okay.  Did you have a meeting on or about September 23rd of
>       2003 with Mrs. Guerra and Mr. Lyons?
>
> A:    Mr. Lyons, yes.
>
> Q:    All right.  Tell me what you can recall about the meeting on
>       September 23rd with Mr. Lyons.
>
> A:    He—he called me in the office, Mr. Lyons, and he said that—that
>       they were—they were writing me up for the incident, what
>       happened with the little girl that was with the umbrella and—and
>       the mother.

(Docket Entry No. 17, Ex. A at 96:21–97:4).

angry customer and sought management intervention immediately.  Johnson believed that she handled the incident appropriately because she was trying to protect Saks's "assets." (Docket Entry No. 17, Ex. A at 92:8–19).  Guerra and Lyons signed the report.  Johnson did not sign.  The report states that she "refused to sign, disputed the facts." (*Id.*).  Johnson testified that she had the meeting on September 23, 2003, (Docket Entry No. 17, Ex. A at 96:21–97:6), and refused to sign the write-up, (*id.* at 99:21–24).  In her affidavit, however, Johnson states that she was not counseled about this incident and did not refuse to sign any document. (Docket Entry No. 19, Ex. E, ¶ 14).  Saks objects to Johnson's affidavit testimony as inconsistent with her earlier deposition testimony.  That objection is addressed below.

The event that directly resulted in Johnson's job termination occurred on March 22, 2004.   Jennifer Aitsebomo, who is African-American and one of Johnson's regular customers, came to the store to return some jewelry.  (Docket Entry No. 17, Ex. A at 116:7–12).  Clarissa Ashley, a customer-service associate in the return department, was helping Aitsebomo.  Ashley called Johnson to check the stock numbers and price for the jewelry.  Saks's policy requires management approval for jewelry returns, so Ashley also called Nancy Scott, the manager of the accessories department, to approve the return. Aitsebomo disagreed with the price Scott quoted, which was steeply discounted from Aitsebomo's purchase price.  Johnson agreed that Aitsebomo had paid more for the jewelry than the amount Scott quoted.  Johnson called Scott in her office and said that Aitsebomo wanted to speak to Scott about the return.  According to Johnson, Scott refused, asking: "For what?  Aren't you taking care of it?  What do you need me for?" (*Id.* at 126:6–11).  Johnson

hung up the phone and walked back to Scott's office to talk with her privately. (*Id.* at 127:17–25).  Johnson was frustrated at Scott, in part because of prior incidents in which she felt Scott had treated Aitsebomo and other African-American customers unfairly. Johnson testified that she told Scott, "I am so sick of this.  I am so sick of this.  Every time [Aitsebomo] comes in here, you know, it's a problem.  It's a problem.  I am so sick of this. . . . Nancy, I really don't feel good today.  You know what?  You go out there and you explain it to [Aitsebomo] and, you know, I just don't feel like explaining this today." (*Id.* at 128:11–18).  Johnson gave her store keys to Guerra, who was standing nearby, and left without finishing her shift.  When Johnson returned on her next scheduled work day, she was fired.  (*Id.* at 162:12–165:9).

Guerra testified that she went to Scott's office when she heard Johnson yelling at "the top of her lungs with Nancy."  (Docket Entry No. 17, Ex. B at 84:1–3).  Guerra testified that Johnson was accusing Scott of being racist and appeared "out of control."  (*Id.* at 84:19–21). Walter Broussard, a selling specialist who was in the store at the time, testified that as Johnson was leaving, "she was still yelling about they wouldn't do this if she was white and stuff like that. . . . You could hear her through the store."  (Docket Entry No. 19, Ex. D at 121:2–19).

Johnson explained what Scott had done in the past that made Johnson angry about the handling of Aitsebomo's return in March 2004.  (*Id.* at 133:3–150:1).  Johnson testified that Scott had approached Johnson and Aitsebomo when Aitsebomo was looking at an assortment of small gift boxes.  Scott stated, "Oh, I remember those—those little boxes give me such a

9

memory of when my family taught black slaves how to read and write." (Docket Entry No. 17, Ex. A at 133:3–22).  The comment made both Johnson and Aitsebomo uncomfortable. Johnson complained about the comment to Adrian Dogan-Carr, the assistant general manager and a plaintiff in a related lawsuit.  Carr later assured Johnson that she had talked with Scott and that it would not happen again.  (*Id.* at 134:3–13).  Johnson testified that Scott did not make any more racially insensitive remarks after that incident.  Johnson also testified that Scott generally treated African-American customers differently than other customers.  For example, Scott would provide non-African-American customers discounts that she did not give to the African-American customers.  (Docket Entry No. 17, Ex. A at 142:3–146:6).  On at least two occasions, Johnson asked Scott if she would approve giving a customer a discount.  Scott replied by asking Johnson the customer's race.  When Johnson replied that the customer was African-American, Scott answered, "No."  (*Id.*).  Johnson testified that Scott frequently approved discounts for one particular Caucasian customer, whose name Johnson could not recall.  (*Id.* at 146:3–9).  Johnson testified that she also reported this behavior to Carr, who said that she would talk with Lyons about it.  Although Johnson did not hear anything more about it from Carr or Lyons, Scott did not ask Johnson about customers' races after that.  (*Id.* at 149:17–19).

In an affidavit, Aitsebomo described her exchanges with Scott, including the March 2004 incident when Scott refused to give her the full price for returned jewelry and refused to discuss it, the incident in which Scott said that her parents were once slave owners and had

taught slaves, and an incident in which Scott asked Aitsebomo how she could afford to purchase nine designer handbags.  (Docket Entry No. 19, Ex. F, ¶¶ 7, 8, 10, 11).

Johnson alleges that Lyons as well as Scott treated non-African-American customers more favorably than African-American customers.  In Carr's affidavit, she described how Lyons also closely scrutinized merchandise returns of African-American customers and monitored them closely, more than he would non-African-American customers.  (Docket Entry No. 19, Ex. B, ¶ 22).  Margaret Johnson, who worked in customer service, stated in her affidavit that Lyons routinely asked African-American customers attempting to return items, "Did you wear this?  Why are you returning it,—what's wrong with it?" and checked the security cameras and register tapes before approving a store credit.  (Docket Entry No. 19, Ex. C, ¶ 7).  Johnson did not see Lyons ask similar questions when other customers returned items.  Johnson stated that for African-American customers, Lyons enforced the Saks policy of allowing returns only if the customer had a receipt and the tags were still on the item but frequently waived the policy for other customers making returns. (*Id.*).  Another former Saks employee, Shalendra Thurston, stated in her affidavit that she saw Lyons allow a Caucasian customer return merchandise that came from another department store and receive store credit without any questions asked, which was against Saks policy.  (Docket Entry No. 19, Ex. D, ¶ 14).

Johnson alleges that both Scott and Lyons treated her and other African-American employees differently than non-African-American employees.  Johnson alleges that Scott scrutinized and criticized her performance more than non-African-American employees.

11

Johnson testified that the scrutiny was particularly intense after Paul Gedwed, Saks's regional vice-president, visited the store and praised Johnson's performance, telling the other employees to emulate her sales techniques. Johnson testified that after Gedwed's visit, Scott routinely criticized her for making even the slightest error. (Docket Entry No. 17, Ex. A at 175:5–24). Johnson stated that Scott "would harass me about every little thing that was done. . . . Any little thing that would go wrong, she would harass me about any little thing." (*Id.* at 176:2–8). Johnson felt that Scott's constant haranguing was due to her race: "I just feel like Nancy just didn't like black people at all." (*Id.* at 177:17–18). Saks argues that Scott may have been jealous of the praise Johnson had received from Gedwed and feared that Johnson was in competition for Scott's job, but that no evidence shows that race played any part.

Several former Saks employees also provided affidavits stating that Lyons treated African-American employees differently than other employees. Margaret Johnson stated that she did not see Lyons discipline a non-African-American sales associate for his routine tardiness, unprofessional appearance, or when his cash register failed to balance, but did discipline African-American associates for similar infractions. (Docket Entry No. 19, Ex. C, ¶ 5). According to Carr, Lyons refused to punish a Caucasian female sales associate for using profanity toward a fellow employee and attempting to start a fight, and refused to discipline a white male employee who had called an African-American coworker a "black bitch." (Docket Entry No. 19, Ex. B, ¶¶ 17, 18). According to Lori Leal, who worked in human resources, Lyons also refused to discipline a non-African-American cashier whose

cash register did not balance on four separate occasions, while African-American cashiers were disciplined if their registers did not balance.  (Docket Entry No. 19, Ex. A, ¶ 15).  Carr stated in her affidavit that Lyons installed a security camera to monitor the African-American employees, but that he did not similarly monitor non-African-American employees.  (Docket Entry No. 19, Ex. B, ¶ 24).  Johnson testified in her deposition that Lyons praised a non-African-American employee who engaged in a shouting match with a customer over the price of an item of clothing.  Lyons put a sign in the employee break room congratulating the employee for the confrontation.  (Docket Entry No. 17, Ex. A at 106:1–107:23).  Carr's affidavit also contains a paragraph stating that Lyons praised the employee who had engaged in the shouting match with a customer.  (Docket Entry No. 19, Ex. B, ¶¶ 26, 27).  Johnson stated in her affidavit that while working at the Fountains store, she heard Lyons call a Saks cashier a "black bitch."  (Docket Entry No. 19, Ex. E, ¶ 10).  Shalendra Thurston, a former Saks employee, stated that she "often" heard Lyons refer to African-Americans as "niggers" and on one occasion also heard Lyons call a cashier a "black bitch."  (Docket Entry No. 19 Ex. D, ¶¶ 5–6).

Lori Leal, who formerly worked in human resources, stated in her affidavit that when she was hired, Lyons told her that he was "scared to hire me because I was black" and that there were "too many black employees at the time in the store."  (Docket Entry No. 19, Ex. A, ¶ 8).  Leal stated that Lyons told her that he was going to "get rid of them," which she took to mean that he wanted to rid the store of the African-American employees.  (*Id.*).  Leal also testified that she heard Lyons refer to a group of African-American employees—a group

13

that included Johnson—as "ghetto." (*Id.*, ¶ 13). Johnson's affidavit does not indicate that she was made aware of Lyons's racially charged remarks, except when he called a coworker a "black bitch" in Johnson's presence.

In this suit, Johnson alleges that Lyons and Scott purposefully set up her termination by creating false or inflated disciplinary write-ups to create a record for firing her. Lori Leal stated in her affidavit that after the March 2004 incident that led to Johnson's termination, Lyons told her that he wanted to fire Johnson but could not because she did not have enough disciplinary write-ups in her file. (Docket Entry No. 19, Ex. A, ¶¶ 10, 11). Saks policy required an employee to have at least three write-ups to warrant termination. Leal stated that she was in a meeting in which Lyons instructed Scott and Guerra to fabricate write-ups for Johnson's file. Lyons told Leal to assist Guerra with the write-ups. Leal stated that they fabricated a write-up for the June 2003 incident with the child and the umbrella and another for the March 2004 incident involving Aitsebomo's jewelry return. Leal stated that Lyons, Scott, and Guerra falsely wrote that Johnson "refused to sign" the write-ups. (*Id.*, ¶ 11).

Johnson also alleges that she was not paid as much as non-African-American employees in her position. In her affidavit, Johnson stated that her requests for a pay raise in 2003 were denied despite the fact that her sales numbers were the highest of any of the selling specialists at the time. (Docket Entry No. 19, Ex. E, ¶ 9). Carr's affidavit contains the statement that she recommended to Lyons that Johnson receive a pay raise on three occasions, but each time Lyons refused. (Docket Entry No. 19, Ex. B, ¶ 14). Carr's affidavit noted that a white sales specialist, Walter Broussard, made at least $3.00 more per hour than

14

Johnson.  (Docket Entry No. 19, Ex. B, ¶ 14).  Carr also stated that African-American

employees were routinely passed over for promotional opportunities, denied requests for pay

raises, and paid less than non-African-American employees.  (*Id.*, ¶¶ 13–21, 25–27).

Margaret Johnson, a customer-service employee whose duties included disbursing payroll

checks and doing financial audits of the cash office, stated in her affidavit that she saw a

disparity in pay between African-American associates and other associates on the sales floor

and in the customer-service department.  (Docket Entry No. 19, Ex. C, ¶ 4).  Margaret

Johnson stated that Sylvia Johnson was the most productive of the selling specialists but was

paid at least $3.00 per hour less than two white counterparts, Jess Bowman and John Gibson.

(*Id.*).

        Johnson submitted an employee earnings chart that shows Bowman employed as a

"Selling Spec Off 5th" and earning $13.94 per hour.  (Docket Entry No. 19, Ex. G).

Gibson's title is listed as "Sales Assoc SFAE"; he made $11.70 per hour.  (*Id.*).  Broussard

is listed as a salaried "Sales Mgr" earning $1,343.29 per pay period.  (*Id.*).  The earnings

chart states that Broussard's "Sales Mgr" position began on August 1, 2004.  Johnson also

submitted a copy of Broussard's April 9, 2004 paycheck stub, which shows that he earned

$13 per hour; it does not provide his job title at that time.[3]  (*Id.*).  Sylvia Johnson's position

is listed as "Sales Assoc SFAE"; she earned $10.30 per hour.  (*Id.*).

---

[3] Broussard's April 9, 2004 paycheck stub shows that during the pay period ending April 3, 2004, Broussard worked 39.78 hours and earned $517.14, which equates to $13 per hour.  (Docket Entry No. 19, Ex. G).

Saks argues that Broussard, Bowman, and Gibson were paid higher wages than Johnson because they had more retail experience. Broussard testified he had worked in retail for approximately 23 years, as compared to Johnson's 11 years. (Docket Entry No. 17, Ex. D at 10:17–16:15). Broussard also served as a department manager at another retail department store before joining Saks. (*Id.* at 13:18–14:4). Bowman had also been a department manager before he worked as a selling specialist. (Docket Entry No. 17, Ex. A at 185:22–186:16). Johnson acknowledged that she had never been a department manager. (*Id.* at 186:14–16). Gibson had worked for Saks since December 9, 1999 and had been a lead sales associate before becoming a selling specialist. (Docket Entry No. 17, Ex. E). Johnson began working at Saks in October 2000 and had never been a lead sales associate.

Johnson also complains that Saks discriminated against African-American employees in making promotions. Shalendra Thurston, an African-American sales associate, stated in an affidavit that she had been working in the customer service department for approximately one year when she applied for a job as lead cashier. Lyons denied her application and hired a non-African-American employee without experience in cashiering or auditing. (Docket Entry No. 19, Ex. D, ¶ 9). Lyons subsequently required Thurston to train the new employee for the position. (*Id.*). As noted, Carr also stated in her affidavit that Saks routinely passed over African-American employees who sought promotions. However, Johnson testified that she did not seek or apply for any other job at Saks after receiving the promotion to selling specialist in 2002. (Docket Entry No. 17, Ex. A at 180:15–17). Saks granted Johnson's request to work part-time beginning in January 2004. (Docket Entry No. 17, Ex. A-8).

Saks objects to, and moves to strike, much of the affidavit testimony Johnson submitted in her response to the summary judgment motion.  (Docket Entry No. 20).  The motion to strike and Johnson's response are addressed below.

## II.    The Motion to Strike the Summary Judgment Affidavits

Saks objects to parts of the following affidavits submitted as summary judgment evidence:  Lori Leal's affidavit, (Docket Entry No. 19, Ex. A); Adrian Dogan-Carr's affidavit, (Docket Entry No. 19, Ex. B); Margaret Johnson's affidavit, (Docket Entry No. 19, Ex. C); Shalendra Thurston's affidavit, (Docket Entry No. 19, Ex. D); Sylvia Johnson's affidavit, (Docket Entry No. 19, Ex. E); and Jennifer Aitsebomo's affidavit, (Docket Entry No. 19, Ex. F).  Saks objects that these affidavits contain anecdotal evidence that is inadmissible because it is hearsay, unsubstantiated, and speculative.  Saks also argues that portions of Johnson's affidavit contradict her deposition testimony and should be excluded on that basis.

Federal Rule of Civil Procedure 56(c) provides that "judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(e) states that

> affidavits shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.  Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto and served therein.  The court may permit affidavits to be

> supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

Fed. R. Civ. P. 56(e).

### A.    Lori Leal's Affidavit

Saks objects to paragraphs 3 through 6 of Lori Leal's affidavit, which describe the process by which employees were granted leave, because it is not based on personal knowledge. The objection to those paragraphs is denied. Leal testified that she worked as a human resources associate whose duties included overseeing employee benefits. (Docket Entry No. 19, Ex. A, ¶ 2).

Saks argues that paragraph 7, which states that Leal saw Lyons and other Saks management treat African-Americans "less fairly," is unsupported by specific facts. This objection is also denied. The paragraphs that follow in Leal's affidavit provide specific instances of treatment that Leal witnessed. (*Id.*, ¶¶ 8–19).

Saks also objects that the following statement in paragraph 9 of Leal's affidavit is unsupported by specific facts and is speculative: "I understood at that time that [Sylvia] Johnson was highest in sales among selling specialists." Johnson argues that Leal's statements were based on personal observations, but does not identify what observations provided the foundation for her belief. Leal worked in human resources. Her job duties included "distributing payroll, approving returns, customer service, and overseeing scheduling and employee benefits." She stated that she had daily interactions with the selling specialists and other employees, but the record does not show that she had personal

18

knowledge of the sales figures of different personnel.  (Docket Entry No. 19, Ex. A, ¶ 2).

There is no factual basis provided for the statement that Leal believed that Johnson's sales

numbers were the highest of the selling specialists.  *See Grimes v. Tex. Dep't of Mental*

*Health & Mental Retardation*, 102 F.3d 137, 139 (5th Cir. 1996) ("Needless to say,

unsubstantiated assertions are not competent summary judgment evidence.").  Saks's motion

to strike this part of paragraph 9 is granted.

Saks objects that the following part of paragraph 9 in Leal's affidavit is speculation:

"Mr. Lyons told me to put the payroll away because he did not want Mrs. Carr to see the

disparity in pay of African-Americans to others."   It is unclear if Leal is repeating what

Lyons told her was his reason for instructing her to put the payroll away or if Leal is

speculating as to why Lyons gave her that instruction.  If it is the latter, the objection would

be well-taken.  If Leal is repeating what she heard Lyons state, the objection would be

denied.

Saks also objects to paragraphs 10 through 12 of Leal's affidavit, in which she stated

that Lyons "set up" Sylvia Johnson to be fired.  Saks argues that Leal's belief is not based

on personal knowledge, that many of the statements in these paragraphs are based on hearsay

and speculation, and that many of the statements are contradicted by Johnson's deposition

testimony.  Leal stated that she was in a meeting when Lyons instructed Nancy Scott and

another Saks employee to fabricate disciplinary actions against Johnson.  Leal also stated that

she was instructed to help.  (Docket Entry No. 19, Ex. A, ¶ 11).  Such testimony is not

speculative.  Nor is this testimony inadmissible as hearsay.  Leal testified that she heard

19

Lyons, the general manager, tell Scott and other employees to fabricate disciplinary reports. Leal's testimony as to statements she heard Lyons make is admissible under Rule 801(d) of the Federal Rules of Evidence.  Saks does not indicate which parts of Johnson's deposition testimony it believes contradict Leal's affidavit.   In paragraph 11 of Leal's affidavit, she states that in March 2004, Scott and Guerra fabricated a disciplinary write-up against Johnson for the incident involving the mother who became angry when Johnson took an umbrella away from her child.  This part of the affidavit conflicts with Johnson's deposition testimony in which she states that she was written up for that event in a September 29, 2003 meeting.  (Docket Entry No. 17, Ex. A at 86:4–12).  Even if there is a conflict between the affidavit testimony of one witness and the deposition testimony of another witness, however, that is not a basis to exclude either.  The issue is whether the conflict creates a disputed issue of material fact.  The motion to strike paragraphs 10 through 12 of Leal's affidavit is denied.

Saks objects that the other Saks employees who are discussed in paragraphs 14 and 15 of Leal's affidavit were not similarly situated to Johnson.  These paragraphs are based on personal observations and discuss statements and conduct by Lyons and Nancy Scott, the people Johnson complains of in this suit.  Whether those individuals are sufficiently similarly situated to Johnson may affect whether evidence of their treatment gives rise to a genuine issue of disputed fact material to Johnson's discrimination claim, but the evidence nonetheless is competent.  *See Shattuck v. Kinetic Concepts, Inc.*, 49 F.3d 1106, 1109–10 (5th Cir. 1995) ("There is no proscription of evidence of discrimination against other members of the plaintiff's protected class; to the contrary, such evidence may be highly

probative, depending on the circumstances."); *Visser v. Packer Eng'r Assoc., Inc.*, 924 F.2d 655, 659–60 (7th Cir. 1991) (en banc) (stating that evidence of fellow employees testifying in civil rights suits to racial slurs or other acts of racial discrimination against them by the employer are admissible because they are based on personal observation or otherwise within personal knowledge).

Saks objects to paragraph 16 of Leal's affidavit as unsupported by specific facts. Leal stated that she saw Lyons review security tapes before approving returns for African-American customers but did not see him do so for non-African-American customers. This statement is based on Leal's personal observations and the motion to strike it is denied. To the extent that paragraph 16 states conclusions beyond Leal's personal knowledge, the motion to strike is granted.

Saks also objects to paragraph 17, arguing that it contains nothing more than Leal's subjective belief and is unsupported by specific facts. In paragraph 17, Leal stated that she helped Adrian Dogan-Carr prepare the paperwork for her June 2004 FMLA leave and that while Carr was on leave, Lyons introduced another employee as Carr's replacement. The paragraph is based on personal knowledge. The motion to strike paragraph 17 is denied.

Saks also objects to the statement in paragraph 18 of Leal's affidavit, that Lyons did not want Carr to return to Saks after her first leave of absence, as conjecture and speculation. This court agrees. The first sentence of paragraph 18 is stricken from the summary judgment evidence.

### B.    Adrian Dogan-Carr's Affidavit

Saks objects to paragraph 7 of Carr's affidavit, which relates the treatment of a white Saks employee in the Tucson, Arizona store who took an extended leave of absence. Saks objects that this paragraph is irrelevant. In this lawsuit, Johnson complains of conduct by Lyons and Nancy Scott; the treatment of Saks employees in other locations under different management is irrelevant. The motion to strike paragraph 7 is granted.

Saks also objects to paragraph 10 on similar grounds. In paragraph 10, Carr states that she was treated differently than the assistant general managers of other Saks stores in Texas because she also had to manage the women's department, while the (non-African-American) assistant general managers of the other stores did not carry this dual responsibility. The treatment of assistant general managers at other stores is not relevant to Johnson's claims. The motion to strike paragraph 10 is granted.

Saks moves to strike paragraph 11 on the ground that Carr has no personal knowledge of Lyons's use of racial slurs. Carr's knowledge of the statements in paragraph 11 all came through other employees. Testimony from these employees relating Lyons's racial slurs made to them or in front of them is admissible as an admission; testimony by Carr that she was told of these statements is double hearsay and no exception to the hearsay rule applies. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c). As a general rule, "[h]earsay is not admissible except as provided by these rules." FED. R. EVID. 802. Federal Rule of Evidence 801(d)(2) provides in pertinent part:

> A statement is not hearsay . . . if the statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity, or . . . (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.

A statement by a supervisory official who plays a role in the decisionmaking process is generally admissible. *See, e.g.*, *Miles v. M.N.C. Corp.*, 750 F.2d 867, 873–75 (11th Cir. 1985). The statements by Saks employees describing what Lyons said to them or in front of them are admissible as a party admission under Rule 801(d)(2)(A), as well as a statement by a supervisor about a matter within the scope of his agency under Rule 801(d)(2)(D). Carr's testimony about what coworkers told her about what Lyons told them or said in front of them presents a "double hearsay" problem. Under the federal rules, "[h]earsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." FED. R. EVID. 805; *see United States v. Pendas-Martinez*, 845 F.2d 938, 942–43 (11th Cir. 1988) (both levels of hearsay must be excepted from the hearsay rule).

Courts generally hold that a statement by a coworker relating the alleged statement of a supervisor with decisionmaking authority does not concern a matter within the scope of the coworker's employment when the declarant is neither the plaintiff's supervisor nor has a significant role in the employment decision at issue. In *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1456–57 (11th Cir. 1997), the court held that the plaintiff's testimony that his coworkers told him that his supervisor had made age-biased statements to

23

them was inadmissible hearsay.  The hearsay problem rested in the statements by the
coworkers to the plaintiff, because those statements were not made within the scope of the
declarants' authority at the company.  In *Jacklyn v. Schering-Plough Healthcare Products
Sales Corp.*, 176 F.3d 921, 927–28 (6th Cir. 1999), the court held that statements were not
within scope of employment when the declarant was not the plaintiff's supervisor during the
relevant period and was not involved "in any of the critical appraisals of her performance that
preceded her leaving work."  This approach dovetails with the principle that statements
regarding employment matters are within the scope of employment if the declarant was "an
advisor or other significant participant in the decision-making process that is the subject
matter of the statement."  *Breneman v. Kennecott Corp.*, 799 F.2d 470, 473 (9th Cir. 1986)
(holding that statements were not within the scope of employment when the declarants
relating what a decisionmaker said were not involved in the company's discharge of the
plaintiff);  *see also Howley v. Town of Stratford*, 217 F.3d 141, 155 (2d Cir. 2000) (testimony
by the plaintiff that other firefighters told her of statements by a supervisor was inadmissible
to prove that the supervisor actually made the statements); *cf. Bevan v. Honeywell, Inc.*, 118
F.3d 603, 610–11 (8th Cir. 1997) (statement by the plaintiff's immediate supervisor relating
what a supervisor with greater authority had said about the relevant employment decision
was within the scope of the immediate supervisor's employment); *Abrams v. Lightolier, Inc.*,
50 F.3d 1204, 1215–16 (3d Cir. 1995) (holding that plaintiff's coworker could testify to what
supervisor had said to him about the "criteria utilized by management in making decisions
on hiring, firing, compensation, and the like"; the statement was not double hearsay because

the coworker himself, rather than the plaintiff, was offering the testimony); *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1238 n.1 (2d Cir. 1995) (statements of intermediate supervisors relating the statement of a superior with decisionmaking authority were within the scope of employment when one of the intermediate supervisors had been instructed to fire the plaintiff and the other was plaintiff's immediate supervisor who reported to the superior on the plaintiff's performance and status); *Zaken v. Boerer*, 964 F.2d 1319, 1323 (2d Cir. 1992) (statement by a supervisor who "had ostensible authority over and took part in personnel decisions regarding hiring and firing of sales staff" was within the scope of employment and was admissible when testified to by a nonplaintiff employee who heard the statement first hand).

Carr's statement in paragraph 11 that another Saks employee told her what Lyons said to or in front of that employee raises a double hearsay problem. The objection is sustained and the motion to strike is granted.

Saks also objects to paragraph 12, arguing that it is unsupported by specific facts. In that paragraph, Carr stated that while she was employed at Saks, she saw Lyons, Scott, and Guerra discriminate against African-Americans. Carr provided some factual basis for the statement. She stated that she saw disparity in pay between African-American employees and others on documents she read as an assistant general manager. She stated that she saw African-American employees receive disciplinary action while other employees received none for similar actions. She also stated that she personally saw African-American customers receive more scrutiny in returning their merchandise than other customers

received.  Paragraph 12 is supported by Carr's personal observations.  The motion to strike paragraph 12 is denied.

Saks also objects to paragraph 13, stating that the individuals discussed in those paragraphs are not similarly situated to Carr or to Johnson.  The comparison of assistant general managers in various Saks stores has no bearing on Johnson's claim.  The motion to strike paragraph 13 is granted.

Saks also moves to strike paragraph 14, in which Carr stated that Sylvia Johnson and Karlene Harris made "a substantially lower wage than the other non-African-American selling specialists."  (Docket Entry No. 19, Ex. B, ¶ 14).  Carr stated that she had regular access to the census sheet, which listed the employees' names, their positions, and their pay rates.  However, Carr has not provided information as to the experience, length of employment, or other factors that affect compensation for these different employees.  Without such information, Carr lacks the personal knowledge that is a necessary predicate to the statement.  The motion to strike paragraph 14 is granted.

Saks objects to paragraph 15, arguing that the individuals referred to in that paragraph are not plaintiffs in this suit.  This court strikes paragraph 15 on the basis that there is no factual support identified.

Saks also moves to strike paragraph 17 on the basis that it does not involve similarly situated employees.  That paragraph details an incident Carr witnessed in which a Caucasian sales associate named Susan Grisales had an altercation with a female Hispanic coworker.  Carr stated that when she reported the incident to Lyons, he refused to take disciplinary

action toward Grisales.  In a racially discriminatory disparate discipline claim, a plaintiff must show that the misconduct for which she was disciplined or discharged was "nearly identical" to that engaged in by the other employee who did not receive such harsh punishment. *See Smith v. Wal-Mart Stores (No. 471)*, 891 F.2d 1177, 1180 (5th Cir 1990) (per curiam) (finding comanagers not similarly situated because they had breached different sections of the store's personnel policy); *see also Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 305 (5th Cir. 2000) (noting that various high-level managers are similarly situated to senior executives, but are not similarly situated to a low-level branch manager).  Johnson was a selling specialist, a position in the same category of employee as sales associate, and also had an altercation with a coworker for which she was disciplined.  The motion to strike is denied.

Saks also moves to strike paragraph 18 on the basis that the incident described in that paragraph does not involve similarly situated employees.  The incident involved a Caucasian employee who allegedly made a racial slur to a coworker and was insubordinate to a supervisor who intervened.  Carr stated in her affidavit that Lyons refused to discipline the employee.  Because Johnson was discharged in part for being insubordinate to her supervisor, and because one of her progressive discipline write-ups was also for insubordination to a supervisor, the incidents are sufficiently similar to warrant consideration.  The motion to strike paragraph 18 is denied.

Saks also objects to paragraphs 19 through 21, which describe how Lyons treated a Shalendra Thurston, an African-American sales associate who, like Johnson, unsuccessfully

27

sought a pay raise from Lyons. Thurston was a sales associate; Johnson was a selling specialist, a position within the same class of employees. Thurston and Johnson are sufficiently similarly situated to make this evidence as to Thurston relevant. The motion to strike it is denied. The motion to strike is, however, granted as to the part of paragraphs 19 to 21 in which Carr complains about Lyons's scheduling of Thurston's work hours and Lyons's refusal to rehire Thurston after a short leave. Johnson testified that she never sought a promotion after she was promoted to selling specialist. (Docket Entry No. 17, Ex. A at 180:15–17). Nor did Johnson ever complain about any scheduling difficulties; she sought and received a schedule change to part-time in January 2004. (Docket Entry No. 17, Ex. A-8). Johnson and Thurston are not similarly situated with respect to these portions of Carr's affidavit. The motion to strike paragraphs 19 through 21 is granted in part and denied in part.

Saks moves to strike paragraph 22 of Carr's affidavit, arguing that it is unsupported by specific facts. Carr testified that she saw Lyons pull security tapes and journal tapes when African-American customers would return merchandise, but never saw him conduct a similar investigation when other customers returned merchandise. This testimony is based on personal knowledge. The motion to strike paragraph 22 is denied.

The motion to strike paragraphs 23 and 24, in which Carr relates statements reportedly made by Lyons relayed to Carr by other employees, is granted; the statements are double hearsay.

The motion to strike paragraphs 25 and 26, which deal with Lyons's favorable treatment of a non-African-American employee, is granted; there is no personal knowledge shown as the basis for these paragraphs.

The motion to strike the statement in paragraph 27, describing Carr's observation of Lyons placing a sign in the break room congratulating a non-African-American employee who had a verbal altercation with a customer, is granted in part and denied in part. It is admitted as evidence of Lyons's alleged racial animus. But the statement in paragraph 27 that Lyons "discriminatorily terminated" Sylvia Johnson is stricken as a legal conclusion.

Saks objects to the statements in paragraph 28, arguing that they are based on hearsay. The statements that Leal told Carr that Lyons had called a group of African-American employees "ghetto," and that Lyons had told Leal that he wanted to "get rid of all the black employees one by one," are double hearsay in Carr's affidavit and are stricken.

Saks objects to the statement in paragraph 32 that Leal told Carr that Lyons told Leal that "there are going to be issues with Ms. Carr now that she is pregnant." This statement is double hearsay and irrelevant to Johnson's claim. It is stricken.

Saks moves to strike paragraph 33, in which Carr stated that she went on FMLA leave in June 2004 because Lyons's "harassment" caused her to suffer pregnancy complications. These allegations are both speculative and irrelevant to Johnson's claim. The motion to strike paragraph 33 is granted.

Paragraph 34 also discusses Carr's allegations that she was demoted from assistant general manager when she returned from FMLA leave.  These allegations are irrelevant to Johnson's claims; the motion to strike paragraph 34 is granted.

Saks also objects that paragraphs 35 and 36 conflict with Carr's deposition testimony and that Carr is not competent to testify to the cause of her pregnancy complications.  These paragraphs are not relevant to Johnson's claim and are stricken on that basis.

Paragraph 38 states Carr's personal belief that she was terminated from her job because of her race and pregnancy.  Carr's personal belief is irrelevant to Johnson's claims.  The motion to strike paragraph 38 is granted.

### C.    Margaret Johnson's Affidavit

Saks moves to strike Margaret Johnson's affidavit because the plaintiff failed to identify her as a person with knowledge of relevant facts in her Rule 26 initial disclosures.  The plaintiff does not respond to this argument.  Rule 26(a)(1)(A) of the Federal Rules of Civil Procedure requires parties to disclose "each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment."  FED. R. CIV. P. 26(a)(1)(A).  Parties must also supplement their Rule 26 disclosures at appropriate intervals.  FED. R. CIV. P. 26(e)(1).  Parties who fail to satisfy these disclosure and supplementation requirements are prohibited from using the undisclosed evidence "at trial, at a hearing, or on a motion," unless the failure is harmless.  FED. R. CIV. P. 37(c)(1).  Because the plaintiff failed to disclose Margaret Johnson as a person with knowledge of relevant facts and now attempts to rely on her affidavit testimony, without

having afforded Saks the opportunity to depose Johnson before the end of the discovery period, this failure is not harmless.  Because the plaintiff failed to disclose to Saks that Margaret Johnson was an individual with relevant facts and did not supplement the disclosures before discovery ended, the motion to strike Johnson's affidavit is granted.

### D.    Shalendra Thurston's Affidavit

Saks objects to paragraph 4 of Shalendra Thurston's affidavit, arguing that it is not supported by specific facts.  In that paragraph, Thurston states that during her employment at Saks, she saw Lyons discriminate against African-Americans.  This paragraph is supported by the remainder of her affidavit, in which Thurston states that she heard Lyons use derogatory and racially charged terms to describe African-American employees.  The motion to strike paragraph 4 is denied.

Saks also moves to strike paragraph 7, in which Thurston states that Leal told her that Lyons had made a derogatory comment directed to Thurston.  This paragraph is double hearsay; the motion to strike that paragraph is granted.

Saks objects to paragraphs 8 through 12 on the basis of relevance, arguing that the individuals discussed in those paragraphs are not similarly situated to Johnson.  Paragraphs 8 and 9 describe Thurston's attempt to secure a pay raise and job promotion to lead cashier, Lyons's denial of both requests, and Lyons's decision to hire a less qualified Caucasian for the lead cashier position.  Thurston was a sales associate and is similarly situated to Johnson in that they both sought pay raises; however, they did not both seek promotions.  The motion to strike paragraphs 8 and 9 is granted in part and denied in part.

31

In paragraphs 10 through 12, Thurston describes the incident in which a Saks employee cursed at a customer and not only escaped discipline but was rewarded with Lyons's approval. Much of Thurston's description is not based on what she saw, but on what the employee involved told her. The motion to strike these parts of paragraphs 10 through 12 is granted on the basis of hearsay. The motion to strike the part of the description that is based on Thurston's personal observation is denied.

Saks also moves to strike paragraphs 13 and 14, arguing that they are unsupported by specific facts. Thurston stated that she saw Lyons and Scott scrutinize the returns of African-American customers but not the returns of other customers. In paragraph 14, Thurston stated that she saw a Caucasian customer return an item from another department store without inquiry from Lyons or Scott. The statements appear to be based on Thurston's personal observation. The motion to strike is denied.

The motion to strike paragraph 16 is granted. Whether Saks hired relatives of one race but not another is not relevant to Johnson's claims.

E. **Sylvia Johnson's Affidavit**

Saks moves to strike the statement in paragraph 7 of Sylvia Johnson's affidavit that she "was the highest selling specialist in sales" because it is unsupported by specific facts. Johnson does not provide any information about the basis for this statement. Saks's motion to strike paragraph 7 is granted.

Saks also moves to strike Johnson's testimony in paragraph 8 that she was subjected to and witnessed discrimination by Lyons and others.  This statement is supported by the remainder of her affidavit.  The motion to strike paragraph 8 is denied.

Saks also moves to strike the testimony in paragraph 9 that Lyons's refusal to give Johnson a raise was racially motivated.  To the extent the paragraph speculates as to Lyons's motives in refusing to give Johnson a raise, the motion to strike is granted.

Saks objects to paragraphs 10 through 14 because they conflict with Johnson's deposition testimony.   Saks does not identify those portions of Johnson's deposition testimony it believes are contradicted by these paragraphs.  Paragraph 10 states that Johnson complained of Lyons's racist remarks by calling Saks's anonymous toll-free employee-complaint line.  Johnson did not make a similar allegation in her deposition.  But Johnson did not testify that she did not make this call, nor was she asked whether she ever called the Saks 1-800 number.  The court does not find that paragraph 10 is inconsistent with her deposition testimony.

Paragraph 11 describes the "go-backs" incident for which Johnson was disciplined in 2002.  Johnson disputes that she acted inappropriately, that she received any counseling or disciplinary write-up, or that she refused to sign a disciplinary write-up for this event.  Johnson testified in her deposition that her supervisor, Nga Le, did discuss this incident with her but did not ask her to sign any document.  (Docket Entry No. 17, Ex. A at 66:5–74:11).  To the extent paragraph 11 states that Johnson never discussed this incident with any of her supervisors, it conflicts with her earlier testimony.  A consistent line of authority provides

33

that a court considering a summary judgment motion may disregard a nonmovant's affidavit that contradicts, without explanation, her previous deposition testimony. *See S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996); *Thurman v. Sears, Roebuck & Co.*, 952 F.2d 128, 136 n.23 (5th Cir. 1992). "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168–72 (7th Cir. 1995). However, courts must be careful to distinguish between "discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." *Id.* at 1169–70. Johnson clearly testified that she discussed this incident with Le, although she disputes that it was a counseling. To the extent paragraph 11 states that Johnson did not talk about the incident with a supervisor, that clearly conflicts with Johnson's deposition testimony and no explanation is provided. The motion to strike that affidavit statement is granted. The motion to strike the affidavit statement that Johnson never refused to sign a disciplinary write-up about this incident does not contradict her earlier deposition testimony; the motion to strike this part of the affidavit is denied.

Paragraph 12 discusses the March 29, 2003 incident between Johnson and her coworker, Bonita Thurston, which resulted in disciplinary action against both employees. This paragraph does not conflict with Johnson's earlier deposition testimony.

Paragraphs 13 and 14 discuss the incident with the child and the umbrella.  The recitation in these paragraphs is not inconsistent with Johnson's earlier deposition testimony of the event, with one exception.  Paragraph 14 states that Johnson never received any counseling about the incident and did not refuse to sign any documentation.  Johnson testified in her deposition that on September 23, 2003, she received a disciplinary write-up in a meeting with Lyons and Guerra.  (Docket Entry No. 17, Ex. A at 86:4–12).  This part of paragraph 14 is stricken because it conflicts with Johnson's deposition testimony and no explanation is provided.[4]

Saks objects to paragraphs 15 and 16, which relate Shalendra Thurston's attempts to secure a pay raise and a promotion.  Thurston was similarly situated to Johnson in that they both requested pay raises from Lyons.  But Thurston was not similarly situated to Johnson in seeking a promotion.  The motion to strike these paragraphs is granted in part and denied in part.

Saks moves to strike the testimony in paragraph 17 that Lyons subjected African-American customers returning merchandise to greater scrutiny than other customers.  Johnson appears to have personal knowledge for her statement, basing it on her observations of Lyons.  The motion to strike paragraph 17 is denied.

---

[4]  Paragraph 13 also states that the umbrella incident occurred on August 28, 2003.  The record is clear that the incident occurred on June 18, 2003, that Saks created the disciplinary write-up on August 28, 2003, and that the write-up was given to Johnson on September 23, 2003.  (Docket Entry No. 17, Ex. A at 86:13–87:6; Docket Entry No. 17, Ex. A-7).  The discrepancy as to the date is not material to resolving the summary judgment motion.

Saks also moves to strike paragraph 18, arguing that Johnson had no personal knowledge to support the assertion that she "personally saw Mr. Lyons and Ms. Scott allow a white customer return non-Saks merchandise from Marshall's for a store credit without question." (Docket Entry No. 19, Ex. E, ¶ 18). Johnson stated that she personally observed this transaction. The motion to strike paragraph 18 is denied.

Saks moves to strike paragraphs 19 and 20, which describe the confrontation between a customer and a Saks employee and Lyons's reaction. To the extent these paragraphs are based on what Johnson saw, the motion to strike is denied. To the extent these paragraphs are based on what the employee, a coworker, relayed to Johnson what Lyons had told her, the motion to strike on the basis of hearsay is granted.

Saks also objects to the testimony in paragraph 21 that "Nancy Scott also discriminated against African-American customers" as conclusory and factually unsupported. This testimony is followed by a specific example of what Johnson felt was a discriminatory comment from Scott directed at an African-American customer. The motion to strike is denied to the extent the paragraph sets out the comment that Johnson heard Scott make. Saks also objects that the comment Johnson attributes to Scott is a "stray remark." The extent to which the evidence as to this and other comments supports Johnson's discrimination claim is analyzed below, but the comments are competent summary judgment evidence. The objection to paragraph 22 is overruled.

Saks objects that paragraphs 23 through 25 conflict with Johnson's deposition testimony. These paragraphs discuss the March 22, 2004 event that led to Johnson's

termination.  This court does not find such inconsistencies between Johnson's deposition testimony and these affidavit paragraphs as to make the affidavit inadmissible, except to the extent that paragraph 25 states that Johnson was never counseled about the event.  Johnson testified in her deposition that she discussed the event with Scott and Guerra on her next work day, which is when she was fired.   (Docket Entry No. 17, Ex. A at 162:16–163:24).

Saks finally objects to paragraph 26, in which Johnson states that she routinely saw Lyons provide face-to-face customer service to non-African-American customers but never saw such service provided to African-American customers.  A witness does not need to provide exact dates of discriminatory conduct or provide the precise number of times the conduct occurred.  *See Harville v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 436 (5th Cir. 2005) (holding that assertions that the plaintiff was "touched 'numerous times' instead of providing exact dates or the exact number of instances" were not so "conclusory" that they should have not have been considered by the court).  Johnson stated that this behavior took place "routinely."  The motion to strike paragraph 26 is denied.

### F.   Jennifer Aitsebomo's Affidavit

Saks objects to Aitsebomo's affidavit because it is conclusory, not based on personal knowledge, and filled with subjective statements.  To the extent that Aitsebomo's affidavit relates her own experiences as a Saks customer, describing the treatment she received and what she witnessed while shopping there, the motion to strike is denied.  To the extent the affidavit presents Aitsebomo's personal beliefs as to the reasons she received such treatment, the motion to strike is granted.

37

### III.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c).  The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact.  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element or claim.  *Celotex*, 477 U.S. at 330.  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.  *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  "An issue is material if its resolution could affect the outcome of the action."  *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  If the moving party fails to meet its initial burden, the summary judgment motion must be denied, regardless of the nonmovant's response.  *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The

nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim.  *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 302 (5th Cir. 2004).  This burden is not satisfied by "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.  "Rule 56 mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

## IV.   The Race Discrimination Claims

### A.      The Legal Standard under Title VII and Section 1981

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin . . . ."  42 U.S.C. § 2000e-2(a)(1).  Claims of discrimination brought under Title VII and Section 1981 require the same proof.  *Felton v. Polles*, 315 F.3d 470, 483–84 (5th Cir. 2002) (citing *Shackelford v. DeLoitte & Touche, LLP*, 190 F.3d 398, 403–04 n.2 (5th Cir. 1999)); *see also LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 n.2 (5th Cir. 1996)

39

("Claims of racial discrimination brought under § 1981 are governed by the same evidentiary framework applicable to claims of employment discrimination brought under Title VII."). The inquiry under Title VII is "whether the defendant intentionally discriminated against the plaintiff." *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004).

When a plaintiff attempts to prove allegations of discrimination through indirect or circumstantial evidence, the claims are considered under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), recently modified in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), and *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004). Under the modified *McDonnell Douglas* approach, the plaintiff has the initial burden of making a *prima facie* showing of race and sex discrimination. *Abarca v. Metropolitan Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005); *Rachid*, 376 F.3d at 312. A plaintiff satisfies this burden by showing that: (1) she is a member of a protected group; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) after she was discharged, she was replaced with a person who is not a member of the protected class. *Frank v. Xerox Corp.*, 347 F.3d 130, 137 (5th Cir. 2003); *Okoye v. Univ. of Tex. Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001); *see also Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005) ("To establish a *prima facie* case of discrimination under § 1981, Appellants must establish that the: (1) are members of a protected group; (2) were qualified for the position held; (3) were discharged from the position; and (4) were replaced by persons outside of the protected group."). The fourth prong may also be met if

40

a plaintiff shows that she was "treated differently from others similarly situated." *Abarca*, 404 F.3d at 941.

If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the adverse employment decision. *Cullwell v. City of Fort Worth*, 468 F.3d 868, 873 (5th Cir. 2006). If a defendant can produce such evidence, the presumption of discrimination dissolves. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000); *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002). The plaintiff must then offer evidence to create a fact issue "either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motives alternative)." *Rachid*, 376 F.3d at 312 (internal quotation and alteration marks omitted); *see also Cullwell*, 468 F.3d at 873; *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005) (analyzing a Title VII claim under the modified approach).

In a mixed-motive case, if the plaintiff shows that the illegal discrimination was a motivating factor, the defendant must respond with evidence that the same employment decision would have been made regardless of discriminatory animus. *Rachid*, 376 F.3d at 312. The plaintiff has the ultimate burden of showing a genuine issue of material fact on whether the defendant discriminated against her on the basis of the plaintiff's membership in the protected class. *Reeves*, 530 U.S. at 143. Johnson has not raised a mixed-motive theory of discrimination. *See Turner v. Baylor Richardson Med. Ctr.*, — F.3d —, —, 2007

41

WL 122003, at *6 (5th Cir. Jan. 19, 2007) ("[The plaintiff] did not properly raise her mixed-motive argument below until her motion for new trial. . . . Because a motion for a new trial cannot be used to argue a case under a new legal theory, the district court was correct in finding that [the plaintiff's] mixed-motive claim was waived."); *Ward v. Midwestern State Univ.*, No. 05-10800, 2007 WL 464693, at *3 (5th Cir. Feb. 7, 2007) (unpublished opinion) (stating that the plaintiff's failure to present any argument related to a mixed-motive alternative at the district court waived any avenue for appeal on that issue); *Jones v. Overnite Transp. Co.*, No. 05-20363, 2006 WL 3627148, at *5 n.1 (5th Cir. Dec. 13, 2006) (unpublished opinion) ("[The plaintiff] waived the mixed-motive theory of intentional discrimination in the district court; therefore, application of the mixed-motive analysis falls outside the scope of this appeal.").

### B.    The Discriminatory Discipline and Termination Claims

Johnson has met her *prima facie* burden.  She was a member of a protected class; she was qualified to be a selling specialist; she was fired in March 2004; and she asserts that other non-African-American employees received no punishment or much less severe punishment for similar infractions, including shouting exchanges with customers and insubordination to supervisors.  In discriminatory discharge cases based on an employee's alleged violation of a "work rule," plaintiffs "may establish a *prima facie* case by showing 'either that [they] did not violate the rule or that, if [they] did, [employees outside the protected class] who engaged in similar acts were not punished similarly.'"  *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995) (quoting *Green v. Armstrong*

42

*Rubber Co.*, 612 F.2d 967, 968 (5th Cir. 1980)); *see also Simmons v. Rothe Dev., Inc.*, 952 F. Supp. 486, 490 (S.D. Tex. 1997), *aff'd*, 132 F.3d 1456 (5th Cir. 1997).  To state a *prima facie* case based on disparate discipline, the employee "must show that [noncomplaining] employees were treated differently under circumstances 'nearly identical' to [theirs]." *Mayberry*, 55 F.3d at 1090 (quoting *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991)).  *See also Simmons*, 952 F. Supp. at 490; *Lee v. Georgia-Pacific Corp.*, 944 F. Supp. 497, 501–02 (S.D. Miss. 1996) (both holding that plaintiff could not prove his case of disparate discipline after admitting to violating the work rule and then failing to prove that employees outside the protected class were treated differently).  As to the fourth prong of the *prima facie* case, the record shows that several similarly situated non-African-American employees were not disciplined or terminated for conduct that was similar to Johnson's.  One employee shouted vulgarities at a customer and received praise from Lyons for doing so. (Docket Entry No. 19, Ex. B, ¶ 26).  Another employee was insubordinate to a supervisor and went unpunished.  (*Id.*, ¶ 18).  A third employee had a loud altercation with a coworker on the floor and received no disciplinary write-up.  (*Id.*, ¶ 17).  Saks does not dispute that Johnson has made a *prima facie* showing.  (Docket Entry No. 17 at 13).

Saks states that it terminated Johnson's employment after several disciplinary warnings because she was insubordinate.  Saks states that Johnson's conduct on any one of these occasions warranted dismissal, that she was given several warnings and adequate time to improve her performance, and that after the March 2004 incident, management decided that Johnson's performance had not improved.  Saks argues that it was Johnson's conduct,

not her race, that caused her dismissal.  Saks has presented a legitimate, nondiscriminatory reason for deciding to fire Johnson.

Johnson contends that Saks's proffered reason for her termination is a pretext for race discrimination.  Johnson points to evidence that creates fact issues as to whether at least some of the disciplinary write-ups in her file were real or fabricated and whether the punishment was discriminatorily harsh.  Lori Leal stated in her affidavit that she was in a meeting with Lyons, Scott, and Guerra in which Lyons instructed them to falsify disciplinary papers to justify Johnson's termination.  (Docket Entry No. 19, Ex. A, ¶ 11).  Leal also stated that when Lyons hired her, he said that he was nervous about hiring another African-American and wanted to "get rid" of the current African-American employees.

The summary judgment evidence shows disputed fact issues material to determining whether the decision to discipline and then fire Johnson was racially discriminatory disparate discipline.  Johnson disputes that she received the December 2002 write-ups—one for excessive tardiness and one for insubordination.  Although Johnson does not dispute that she was counseled for the latter incident regarding "go-backs" and that she was late for work frequently during that time, she disputes that she was insubordinate to her supervisor. Johnson also disputes that other similarly situated non-African-American employees committing similar offenses for which she was written-up received similar discipline.  As to the incident involving the altercation with the customer, Johnson has presented evidence that the incident occurred three months before she received any indication that she had behaved improperly, much less disciplined.

The record also contains other evidence of racial animus on the part of both Lyons and Scott, the general manager and department manager who were Johnson's supervisors during the relevant period.  Lyons "often" called African-American employees "niggers" and called another employee a "black bitch."  Scott also made racially derogatory comments about African-Americans, asking Johnson on several occasions whether a customer was white or black before approving a return or providing them with a discount.  (Docket Entry No. 17, Ex. A at 142:3–146:6).  When evidence of workplace remarks are offered as proof of pretext, the probative value of such remarks as evidence of discrimination depends on the extent to which the remarks were related to the protected class of persons of which the plaintiff is a member, were proximate in time to the employment decision at issue, were made by an individual with authority over the employment decision at issue, and were related to the employment decision at issue.  *See Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218 F.3d 392, 400–01 (5th Cir. 2000); *Krystek v. University of S. Miss.*, 164 F.3d 251, 256 (5th Cir. 1999); *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655–66 (5th Cir. 1996).  Evidence of workplace remarks that does not amount to "direct" evidence may nonetheless have probative value in showing that discrimination motivated the challenged employment decision: the Supreme Court has cautioned that a court should not exclude or discount "potentially damning" workplace comments merely because they "were not made in the direct context of [plaintiff's] termination." *Reeves*, 530 U.S. at 152.  However, a remark may be so deficient under one or more of the listed criteria—for example, remote in time from the challenged action or not made by a relevant decisionmaker—as to be a stray remark wholly

45

lacking in probative value even as "indirect" evidence of discrimination.  *See, e.g.*, *Patel v. Midland Memorial Hosp. & Med. Ctr.*, 298 F.3d 333, 343–44 (5th Cir. 2002); *Krystek*, 164 F.3d at 256; *Boyd v. State Farm Ins. Cos.*, 158 F.3d 326, 329–30 (5th Cir. 1998), *cert. denied*, 526 U.S. 1051 (1999); *see also Moore v. United Parcel Serv., Inc.*, 150 Fed. App'x 315, 318 (5th Cir. 2005) (unpublished opinion); *Trotter v. BPB Am., Inc.*, 106 Fed. App'x 272, 276 (5th Cir. 2004) (unpublished opinion) (citing Krystek, 164 F.3d at 256).  The comments by Lyons and Scott are related to Johnson's protected class, are by her supervisors, and are not remote in time from when she was disciplined and then fired.

Based on Johnson's *prima facie* case and evidence of pretext, this court finds that Johnson raises a disputed issue of fact material to whether she was disciplined and fired because of her race.  *Reeves*, 530 U.S. at 136.  The summary judgment motion is denied as to Johnson's claims of racially discriminatory discipline and discharge.

Johnson fails to make any allegations or identify or present any summary judgment evidence that the decisions to discipline or fire her were based on her sex.  She does not contend that she was treated differently than male employees similarly situated; she argues only race discrimination.  Johnson's claims based on sex discrimination fail as a matter of law.

### C.     The Unequal Pay Claim

To make a *prima facie* showing of discrimination in compensation, a plaintiff must show that she is a member of a protected class and is paid less than a nonmember for work

requiring substantially the same responsibilities. *See Uviedo v. Steves Sash & Door Co.*, 738 F.2d 1425, 1431 (5th Cir. 1984).

The record shows that Johnson was making $10.30 per hour when she was fired. (Docket Entry No. 19, Ex. G).  She has presented evidence that other Caucasian employees made significantly more:  Walter Broussard made $13.00 per hour; Jess Bowman made $13.94 per hour; and John Gibson made $11.70 per hour.  (Docket Entry No. 19, Ex. G).

Saks argues that Broussard, Bowman, and Gibson were paid a higher hourly rate than Johnson because they had more experience in retail and in management.  Saks has proffered legitimate, nondiscriminatory reasons for paying Broussard, Bowman, and Gibson more than Johnson.   Broussard testified he had worked in retail for approximately 23 years, as compared to Johnson's 11 years.  (Docket Entry No. 17, Ex. D at 10:17–16:15).  Broussard also served as a department manager at another retail department store before joining Saks. (*Id.* at 13:18–14:4).  Bowman had also been a department manager.  Johnson has never held that title.  (Docket Entry No. 17, Ex. A at 185:22–186:16).  Gibson had worked for Saks since December 9, 1999 and had been a lead sales associate before becoming a selling specialist.  (Docket Entry No. 17, Ex. E).  Johnson began working at Saks in October 2000 and had never been a lead sales associate.

Johnson does not controvert the evidence as to the retail and management experience of the employees she identified as comparators.   There is no disputed fact issue material to determining whether Johnson's disparity in pay compared to Broussard, Bowman, and Gibson is based on race or sex.

Johnson also asserts a disparate impact theory to support her claim of unequal compensation.  To establish a disparate impact claim, a plaintiff must show that there is a specific, facially neutral employment practice, that there is a statistically significant disparity among members of different groups affected by the practice, and that there is a causal nexus between the facially neutral employment practice and the statistically significant disparity. Disparate impact claims, recognized in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), do not require proof of intent to discriminate.  A plaintiff must identify specific practices as responsible for the asserted disparities, *see Johnson v. Uncle Ben's, Inc.*, 965 F.2d 1363, 1367 (5th Cir. 1992), and must present a systemic analysis of those employment practices. *See Black Fire Fighters Ass'n v. City of Dallas*, 905 F.2d 63, 63 (5th Cir. 1990).  Once it is shown that the employment standards are discriminatory in effect, the employer must meet "the burden of showing that any given requirement (has) . . . a manifest relationship to the employment in question."  *Dothard v. Rawlinson*, 433 U.S. 321 (1977).  If the employer proves that the challenged requirements are job-related, the plaintiff may then show that other selection devices without a similar discriminatory effect would also "serve the employer's legitimate interest."  *Id.*; *see also Connecticut v. Teal*, 457 U.S. 440, 447 (1982) (stating that a Title VII plaintiff may still prevail after an employer-defendant's showing of business necessity "if he shows that the employer was using the practice as a mere pretext for discrimination"); *Int'l Bhd. of Elec. Workers v. Miss. Power & Light Co.*, 442 F.3d 313, 317 (5th Cir. 2006) (stating that the plaintiff, rather than the defendant, has the burden of showing acceptable alternative employment practices).

48

In her First Amended Original Complaint, Johnson alleges that "Saks has maintained a system for making promotion and compensation decisions that is excessively subjective and which has a disparate impact on Plaintiff and other African-American and female employees." (Docket Entry No. 7 at 6). Johnson has not identified any facially neutral employment policy or practice that resulted in a significantly adverse impact on African-American or female employees. *See Page v. U.S. Indus., Inc.*, 726 F.2d 1038, (5th Cir. 1984). Johnson instead presented evidence that individual acts and decisions of Harle Lyons and Nancy Scott resulted in the discrimination she alleged. There is no evidence of facially neutral employment practices or policies that resulted in a statistically significant disparity among members of different groups affected by those practices or policies, or of a causal nexus between a facially neutral employment practice or policy and the statistically significant disparity. The disparate impact theory of unequal compensation fails as a matter of law.

Summary judgment is granted as to Johnson's unequal compensation claim.

### D.     The Failure to Promote Claim

To make a *prima facie* showing of discriminatory failure to promote, a plaintiff must show that: (1) she is a member of a protected class; (2) she sought and was qualified for an available position; (3) she was not selected for that position; and (4) the employer awarded the position to someone outside the protected class. *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 680–81 (5th Cir. 2001); *see also Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 317 (5th Cir. 2004).

Johnson has established that she was a member of a protected class.  The summary judgment evidence, however, precludes a finding that she has made a *prima facie* showing as to the other three elements.  There is no evidence that Johnson sought an available promotion, that a position was available, that she was denied that position, or that a nonmember of the protected class filled the vacancy.  Johnson was employed as a selling specialist from 2002 until she was fired in 2004.  She testified that during that time she never sought or applied for a promotion.  (Docket Entry No. 17, Ex. A at 180:15–17).  In January 2004, Johnson asked that her work hours be reduced to part-time.  (Docket Entry No. 17, Ex. A-8).  Saks granted this request.  There is no fact issue as to whether Johnson sought or was denied a promotion.  Saks's summary judgment motion as to Johnson's failure to promote claim based on race and sex discrimination is granted.

## V.   The Hostile Work Environment Claim

In a Title VII hostile work environment claim, the elements of a *prima facie* case are that: (1) the plaintiff belongs to a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her being a member of the protected class; and (4) the harassment complained of affected a "term, condition or privilege of employment."[5] *Harvill v. Westward Commn's, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005); *see also Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 381 (5th Cir. 2003) (citing *Watts v. Kroger Co.*, 170

---

[5]   Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n.10 (2002) (citing *Faragher v. Boca Raton*, 524 U.S. 775, 786–87 & n.1 (1998) and *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66–67 (1986)).

F.3d 505, 509 (5th Cir. 1999)).  If the plaintiff alleges that the harassment culminated in a tangible employment action, such as discharge, demotion, or reassignment, the employer may be vicariously liable for the harassment.  If no such tangible employment action is alleged, the issue is whether the harassment was sufficiently severe or pervasive as to alter a term or condition of employment.  *See Burlington Indus. v. Ellerth*, 524 U.S. 742, 753–54 (1998); *see also Jones v. Flagship Int'l*, 793 F.2d 714, 719–20, 721–22 (5th Cir. 1986).

For supervisor harassment to be actionable as a hostile work environment claim, it must be "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).  "To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so."  *Harvill*, 433 F.3d at 434 (citing *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999)).  Determining whether an environment is offensive or abusive requires an *ad hoc* analysis, focusing on factors such as the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993); *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000).  The Supreme Court has repeatedly stated that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms

and conditions of employment.'"  *Faragher*, 524 U.S. at 788 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)).

Johnson alleges that she was subjected to a racially hostile work environment during the time Harle Lyons was the store manager.  (Docket Sheet No. 19 at 16).  She points to evidence that Lyons "often" used the term "nigger" to refer to African-Americans; that she heard Lyons call Clarissa Ashley, another Saks employee, a "black bitch"; that Lyons referred to a group of African-American employees—that included Johnson—as "ghetto"; that Lyons routinely scrutinized the returns of African-American customers more closely than returns made by customers of other races; that Lyons allegedly installed an additional security camera to monitor the African-American employees; that Lyons praised a non-African-American employee for her aggressive verbal altercation with a customer; that Scott made racially insulting remarks to Jennifer Aitsebomo while Johnson was helping Aitsebomo shop; that Scott made it harder for African-American customers to return items and receive store discounts than others; and that Scott "would harass me about every little thing that was done. . . . Any little thing that would go wrong, she would harass me about any little thing." (Docket Entry No. 17, Ex. A at 176:2–8).  Johnson alleges that these incidents and comments created a hostile working environment.

The evidence does not raise a fact issue as to whether Johnson suffered a hostile work environment.  The evidence shows that Lyons did not direct racially offensive comments to Johnson or use them in front of Johnson except on one occasion, when she heard him call a coworker a "black bitch."  (Docket Entry No. 19, Ex. E, ¶ 10).  Johnson's affidavit and

deposition testimony do not show that other Saks employees told her that they heard Lyons use other racially disparaging remarks.  Even if Johnson had learned that Lyons made such comments to other employees, such "second-hand" harassment carries less evidentiary weight in a hostile work environment case.  *See, e.g.*, *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005) (stating that "second-hand harassment," although relevant, carries less weight than remarks or actions directed at the plaintiff); *Jennings v. Univ. of N.C.*, 444 F.3d 255, 272 (4th Cir. 2006) (same); *McKenzie v. Milwaukee County*, 381 F.3d 619, 624–25 (7th Cir. 2004) (holding that the plaintiff's hostile work environment claim failed because many of the incidents complained of were not directed toward the plaintiff); *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759–60 (8th Cir. 2004) (holding that the plaintiff had failed to present sufficient evidence that harassment was severe where comments were not directed toward him, did not refer to him, and in some instances were merely overheard by him); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997) (the fact that most of the comments were not directed at the plaintiff contributes to the conclusion that the evidence was insufficient to show a hostile work environment).

The evidence also shows that Scott did not direct racially demeaning comments to Johnson or use them in front of her except when Scott told a customer that her family used to teach slaves, and when Scott asked Johnson on two occasions whether a customer seeking a return or discount was white or black.  Johnson has not shown that she was subjected to harassing behavior "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Vinson*, 477 U.S. at 67.  The conduct must be

both objectively and subjectively offensive.  *Harvill*, 433 F.3d at 434.  Johnson only heard a handful of disparaging comments from Lyons and Scott.  "Simple teasing, off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  *Faragher v. City of Boca Raton*, 524 U.S. 775, 781 (1998).

Johnson also testified that Lyons and Scott treated non-African-American customers and employees more favorably than African-American customers and employees.  Johnson testified that Scott subjected her performance to close scrutiny, but acknowledged that this increased scrutiny did not begin until after Johnson had received praise from the regional vice-president.  There is an insufficient basis to conclude that the level of scrutiny Johnson received and the allegation that African-American customers and employees were treated more harshly amounted to a hostile work environment.  *See, e.g.*, *Schultze v. White*, 127 Fed. App'x 212, 217–18 (7th Cir. 2005) (unpublished opinion) (plaintiff in sex harassment case did not show she was subject to hostile work environment; evidence included heightened monitoring and close scrutiny of her job performance, sexually derogatory comments, and unequal discipline based on sex); *see also Boyd v. Presbyterian Hosp.*, 160 F. Supp. 2d 522, 541–42 (S.D.N.Y. 2001) (holding that while incidents that an African-American nurse endured, including gossip, lower performance evaluation, and intense scrutiny of her performance, might have been annoying, bothersome, and stress-inducing, incidents did not create racially hostile work environment); *Padilla v. Carrier Air Conditioning*, 67 F. Supp. 2d 650, 661 (E.D. Tex. 1999) (holding that close scrutiny of plaintiff's work combined with

54

employer's slanderous remarks were insufficient to establish racial harassment).  The nature and frequency of the incidents complained of fall short of the level the cases require to raise a fact issue as to whether there was harassing conduct sufficiently severe or pervasive to affect Johnson's working conditions.  *Compare Turner v. Baylor Richardson Med. Ctr.*, — F.3d —, —,  2007 WL 122003, at *7 (5th Cir. Jan. 19, 2007) (holding that supervisor's infrequent and isolated comments directed to the plaintiff about "ghetto children" and other racially insensitive remarks did not rise to the level of severe or pervasive); *and Septimus v. Univ. of Houston*, 399 F.3d 601, 612 (5th Cir. 2005) (holding that one two-hour "harangue" by a supervisor, that supervisor's use of a mocking tone on one occasion, and another supervisor's comment comparing the plaintiff to a "needy old girlfriend" did not amount to a severe or pervasive working environment); *with Harvill*, 433 F.3d at 435–36 (holding that district court erred in not finding a fact issue as to whether repeated groping, kissing, and fondling of plaintiff's breasts and buttocks, and lewd comments about her sex life during a seven-month period was severe or pervasive); *and Walker*, 214 F.3d at 619–22 (holding that hostile work environment claim survives because evidence showed that plaintiff was subjected to years of disparaging comments made to and about her, including "nigger" and "little black monkey").  Saks's summary judgment motion as to Carr's hostile work environment claim based on race is granted.

As to her hostile work environment claim based on sex, Johnson's claim fails as a matter of law.  She has made no allegation or identified or presented summary judgment

evidence that she was subject to any harassment because of her sex. This claim is dismissed, with prejudice.

## VI.    The Retaliation Claim

Title VII makes it an unlawful employment practice for an employer to "discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  To make a *prima facie* case of retaliation under either Title VII or Section 1981, a plaintiff must show that: (1) she engaged in an activity protected by Title VII; (2) she was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action."  *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004).

The *McDonnell Douglas* framework applies to Title VII retaliation claims.  If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to proffer a legitimate rationale for the underlying employment action.  If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation.  *Id.*  The standard of proof at the pretext stage requires the plaintiff to show that the adverse employment action would not have occurred but for her protected conduct.  *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005); *Pineda v. United Parcel Serv., Inc*., 360 F.3d 483, 487 (5th Cir. 2004).

56

Title VII protects an employee who opposes any unlawful employment practice. 42 U.S.C. § 2000e-3(a). To satisfy the 'opposition clause,' [the plaintiff] need not prove that [his employer's] practices were actually unlawful, but only that he had 'a reasonable belief that the employer was engaged in unlawful employment practices.'" *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 428 (5th Cir. 2000) (citing *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. 1981), *cert. denied*, 455 U.S. 1000 (1982)).

In *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405, 2414 (2006), the Court held that the anti-retaliation provision protects an individual "not from all retaliation, but from retaliation that produces an injury or harm." *Id.* "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (quotations omitted). The standard for harm is objective. *Id.* at 2407. The harm must be material; Title VII does not protect an employee from trivial harms, "petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* at 2415. The significance of any given act depends on the particular circumstances of the individual employee. *Id.* at 2415.

To demonstrate the causal prong of the *prima facie* retaliation claim on summary judgment, a plaintiff must at least raise a question about whether the person who subjected her to an adverse employment action was aware of the protected activity. *See Davis*, 383 F.3d at 320 (citing *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883 (5th Cir. 2003) ("[I]n

order to establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the employee's protected activity.")). "At this threshold stage, the standard for satisfying the causation element is 'much less stringent' than a 'but for' causation standard." *Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 191 (5th Cir. 2001).

The record shows that Johnson engaged in four protected employment activities. The first occurred when she complained to Carr about Scott's comment to Aitsebomo about Scott's family teaching slaves, (Docket Entry No. 17, Ex. A at 133:3–134:13), and Scott's favorable treatment of non-African-American customers, (*id.* at 142:3–149:19). The second occurred when Johnson complained to Carr about Lyons hanging a poster in the employee break room congratulating a non-African-American employee for a hostile confrontation with a customer. (*Id.* at 108:3–25). The third occurred when Johnson complained to Lyons about Scott's criticism of her work after Gedwed's positive review. (*Id.* at 177:24–178:10). The fourth occurred when Johnson called the Saks toll-free employee-complaint line to report that Lyons called a coworker a "black bitch." (Docket Entry No. 19, Ex. E, ¶ 10).[6] The record does not indicate with any greater specificity when Johnson made any of these complaints.

The summary judgment evidence does not raise a fact issue as to whether there was a causal link between these complaints and the decision to fire Johnson. To determine the existence of a casual link, courts look to three factors: (1) the employee's past disciplinary record; (2) whether the employer followed its typical policy and procedures in terminating

---

[6] Johnson was fired before she filed her EEOC complaint.

the employee; and (3) the temporal proximity between the employee's conduct and termination.  *Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 508 (5th Cir. 1994).

Johnson's disciplinary file contained a number of negative reviews.  She received disciplinary action for extensive tardiness in December 2002; for being insubordinate toward a supervisor in December 2002; for an altercation with a coworker in March 2003; and for an altercation with a customer in June 2003.  She was not fired until the March 2004 incident.  There is no evidence of any temporal proximity between the complaints Johnson made to Carr, Lyons, and the Saks toll-free complaint service and either the disciplinary write-ups or her March 2004 firing.  To the contrary, it appears that most of the disciplinary write-ups occurred before Johnson made the complaints.  There is also no evidence that either Lyons or Scott knew that Johnson called the anonymous Saks employee-complaint service.  *See Davis*, 383 F.3d at 320.  The record does not give rise to a disputed fact issue material to determining whether Johnson's termination was in retaliation for the complaints she made to or about her supervisors.  Saks's summary judgment motion as to Johnson's retaliation claim is granted.

## VII.   Conclusion

Saks's motion to strike parts of the affidavits Johnson submitted in response to the summary judgment motion is granted in part and denied in part.  Saks's summary judgment motion is granted as to Johnson's claims of sex and race discrimination and retaliation, except the claim that she was disciplined and fired based on her race.

A status conference is set for March 23, 2007, at 9:00 a.m. to set a schedule for resolving the remaining claims.

SIGNED on March 9, 2007, at Houston, Texas.

Lee H. Rosenthal
United States District Judge